UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KATHY JOHNSON BOWLES,

                       Plaintiff,                    **COMPLAINT**

         vs.                           Civil Action No. 6:21-cv-6048

THE STATE UNIVERSITY OF NEW YORK AT
GENESEO, THE STATE UNIVERSITY OF NEW
YORK, THE GENESEO FOUNDATION BOARD,
DENISE BATTLES, JULIE BRIGGS, JOHN
CAMIOLO, KEVIN GAVAGAN, JOHN
GLEASON, HARRY HOWE, DAVID LEVY,
DANIEL LOUGHRAN, and ROBERT WALLEY,
and JOHN DOE(S) and JANE DOE(S),

                       Defendants.

For her Complaint, plaintiff states as follows:

## **INTRODUCTION**

1.     Plaintiff Kathy Johnson Bowles, who goes by "K. Johnson Bowles" or "Johnson," brings this action for monetary damages, to remedy the deprivation of civil rights secured to her by the United States and New York State Constitutions, statutes and regulations, arising out of violations committed by defendants while and after Ms. Bowles served as the College's Vice President for College Advancement ( "Advancement VP") and as the Board's Executive Director.

2.     The defendants' unlawful, unconstitutional actions caused plaintiff substantial and continuing emotional and economic harm, which she now seeks to recover in the form of monetary compensatory and punitive damages, and attorneys' fees and other expenses, including the costs of this action, together with all accrued interest.

## JURISDICTION, VENUE, AND PARTIES

3.     Jurisdiction is conferred by 28 U.S.C. §§1331, 1332, and 1367.

4.     Ms. Bowles, a female citizen of the United States, now resides in North Carolina but resided in New York State during most of the events described herein.

5.     Defendant State University of New York at Geneseo (the "College") is a member of the defendant State University of New York ("SUNY") system, with its principal location in Geneseo (Livingston County), New York.

6.     Upon information and belief, SUNY's principal place of business is at the State University Plaza, 353 Broadway, Albany, New York.

7.     Upon information and belief, defendant Geneseo Foundation Board (the "Board") is a New York not-for-profit foundation that is affiliated with and supports the College, and the Board's principal location is in Geneseo (Livingston County), New York.

8.     Upon information and belief, defendant Denise Battles resides in Livingston County, New York and was, at all times relevant, President of and employed by the College and/or SUNY, and/or the Board.

9.     Upon information and belief, defendant Julie Briggs resides in Livingston County, New York, and at all times relevant, was employed by the College as Assistant Vice-President for Human Resources.

10.     Upon information and belief, defendant John Camiolo resides in New York State and at all times relevant, was a member of the Board.

11.     Upon information and belief, defendant Kevin Gavagan resides in New York State and at all times relevant, was a member of the Board.

12.     Upon information and belief, defendant John Gleason resides in the State of New Jersey and at all times relevant, was a member of the Board.

2

13.     Upon information and belief, defendant Harry Howe resides in Monroe County, New York and at all times relevant, was employed by the College, and a member of its faculty.

14.     Upon information and belief, defendant David Levy resides in Livingston County, New York and at all times relevant, was employed by the College, and a member of its faculty.

15.     Upon information and belief, defendant Daniel Loughran resides in New York State and at all times relevant, was a member of the Board.

16.     Upon information and belief, defendant Robert Walley resides in New York State and at all times relevant, was a member of the Board.

17.     Defendants John Doe(s) and Jane Doe(s) are persons not yet known to Ms. Bowles, whose names will be added once their identities are ascertained.

18.     Upon information and belief, the College, SUNY, and/or the Board receive federal funding.

19.     Upon information and belief, at all relevant times, the defendants acted under color of state law.

20.     Venue is proper herein under 28 U.S.C. §1391(b)(2).

## PROCEDURAL HISTORY

21.     Ms. Bowles filed Complaints with the New York State Division of Human Rights ("DHR") against the College on January 31, 2019 and June 3, 2019 (respectively, the "First and Second College Proceedings"), and against the Board on June 28, 2019 (the "Board Proceeding").

22.     On October 2, 2019, the DHR dismissed the Second College Proceeding. Upon information and belief, the United States Equal Employment Opportunity Commission

("EEOC") issued a ninety-day "Right to Sue" notice for that proceeding on January 24, 2020, a copy of which is attached as **Exhibit A**, but we did not receive that notice until January 20, 2021.

23.    On September 25, 2020, the DHR issued Dismissals for Administrative Convenience of the First College and the Board Proceedings.  On January 14, 2021, we  received Right to Sue notices from the EEOC for those Proceedings, copies of which are annexed hereto as **Exhibits B and C**.

## **FACTS**

24.    From approximately 2006 through 2016, the College had eight (8) different persons in the role of Advancement VP.  The College thus sought to secure a qualified, experienced professional who would serve well in and bring stability to that position.  In July of 2016 – after a national search – the College hired Ms. Bowles, then 52 years old.  In the entire history of the College, Ms. Bowles is the first woman to serve in that position in a permanent capacity.

25.    Ms. Bowles's predecessor was Jon Hysell, Interim Vice President for College Advancement.  Upon information and belief, from 2014 through 2016, Mr. Hysell's compensation was:

>      2014:  $193,729 (for November-December)
>      2015:  $226,491
>      2016:  $246,821.

26.    In 2016, Mr. Hysell only served in a supervisory capacity in Advancement until July, and his role supervising the Communications Department ended in May, 2016.  When the College hired him, upon information and belief, Mr. Hysell had an undergraduate degree and twelve (12) years in higher education advancement experience.

27.    By contrast, Ms. Bowles was compensated as follows:

>      2016:  $100,322 (for July – December, which also included moving expenses)
>      2017:  $205,624
>      2018:  $201,274.

4

28.     When the College hired her in 2016, Ms. Bowles had undergraduate and graduate degrees as well as 27 years of experience in higher education, including work as a faculty member, department head, Assistant Vice President of Corporate and Foundation Relations, and Vice President for Advancement, with substantial experience in supervision, fundraising, alumni relations, communications, and board oversight.

29.     Ms. Bowles often discussed with President Battles, Human Resources Assistant Vice President Julie Briggs, and other cabinet members, including without limitation the Chief Diversity Officer, robbie routenberg (*e.g.*, one-on-one meetings held in April, July, August, and October of 2018), the disparate treatment of her versus her male predecessors.

30.     In addition to the fact that Ms. Bowles is the first woman in the College's history to serve in a permanent capacity as Advancement VP, her male predecessors had less experience and no terminal degrees, whereas Ms. Bowles served previously as a Department Head, Assistant Vice President, and Vice President, and holds a terminal degree.  Still, however, the College compensated Ms. Bowles at a level lower than her less qualified, male predecessors.

31.     The College had trouble finding a suitable Vice President for Administration and Finance, as well as trouble retaining individuals in key executive positions.  Between 2016-2019, the entire senior administration reporting to President Battles turned over, some as many as three times.  Since Ms. Bowles's departure in March of 2019, there have been, upon information and belief, three Advancement Vice Presidents.  A former Vice President for Administration and Finance was known to scream and curse in team meetings; he behaved in much the same way in Cabinet meetings, including yelling and pounding his fist on tables.  Such outrageous, hostile conduct was never addressed by the College President, employees, or Foundation Board members.  In fact, some of these same Board members told Ms. Bowles to be "less confident," "softer," and they regularly hugged and kissed her on the cheek.

## Favoring a Younger, Male Subordinate

32.     As Advancement VP, Ms. Bowles oversaw 20 employees, one of whom was Justin Johnston.  Ms. Bowles hired Mr. Johnston in 2017, when he was in his early thirties. Following unsatisfactory performance and after Ms. Bowles undertook many efforts to secure improvements, she notified him on November 19, 2018 that he would have a Performance Improvement Plan ("PIP").

33.     In the spring of 2018, the Advancement Services Department and Ms. Bowles conducted a review of all scholarship gift agreements for compliance with Title IX, Title VII, and NCAA requirements.  That summer, Ms. Bowles worked with Mr. Johnston and the Director of Advancement Services, Lynn Myers, to create a compliance plan.  Mr. Johnston was assigned to work with donors to make the identified gift agreements compliant.  Ms. Bowles reminded Mr. Johnston several times, but by November, he had still failed to address this assignment. Admissions begins awarding scholarships in the fall.  Although Ms. Bowles was Mr. Johnston's direct supervisor, the College sided with Mr. Johnston and against Ms. Bowles in this situation, and consistently throughout her tenure.

34.     By contrast, Ms. Bowles's performance was excellent, and includes a number of substantial accomplishments.  For example, in Ms. Bowles's 2017 performance evaluation, Ms. Battles commended Ms. Bowles's "willingness to address challenging personnel issues, including less-than-satisfactory performance by division staff… ."  Ms. Battles also expressed her "perception that [Ms. Bowles] establishes high but reasonable standards and holds individuals accountable for achieving them after ensuring they have the tools to do so."

35.     In Ms. Bowles's August 2018 performance evaluation, President Battles stated, among other things, that Ms. Bowles oversaw "a number of exciting and positive outcomes in the Division of College Advancement, key among them the record-setting fundraising at the out-

set of a comprehensive fundraising campaign.  The results evidence her efficacy in the planning and staffing in support of that campaign, a crucially important College initiative."  Ms. Battles also noted that among "key outcomes were success in fundraising, with more than $4 million in cash revenue, a college record; several million in pledges; and an alumni giving level of 10%, a sizeable increase over the preceding year."

## Hostile Work Environment

36.     In early 2018, in a pre-meditated effort with College Professor David Levy, College Professor Harry Howe angrily accosted Ms. Bowles regarding President Battles's then-recent dismissal of Dean Denise Rotondo.  Mr. Howe acted aggressively, physically threatening Ms. Bowles, and warning that harm would befall her and her career if she did not resign from her position as Vice President.  Ms. Bowles immediately reported this incident to President Battles and Human Resources Assistant Vice President Briggs, but was merely told, some six days later, that "the appropriate administrative action has been taken."  After this incident, recognizing Ms. Bowles's justifiable concern for her personal safety regarding Mr. Howe, the College assigned a police officer to escort her.  Upon information and belief, after the incident with Ms. Bowles, Mr. Howe emailed College personnel, stating that he was glad his threats caused Ms. Bowles to become physically ill.

37.     Ms. Briggs explained to Mr. Howe that the Rotondo matter and Ms. Bowles's complaints against him were confidential and that he should not discuss it publicly, nor should he engage in further actions or seek retaliation against Ms. Bowles.  However, Mr. Howe sent emails (including using a campus list serve forum) to numerous employees, alumni, and students demanding Ms. Bowles's termination and soliciting support for his efforts.  Mr. Howe also sent email messages to Advancement and Communications Division employees intimating violence if

Ms. Bowles did not resign.  Soon thereafter, Mr. Howe videotaped a lecture to his students regarding the matter and publicly criticized Ms. Bowles and President Battles; the lecture included a PowerPoint presentation with large photographs of both women.  He then posted that video to YouTube.

38.   Upon information and belief, Mr. Howe posted on Twitter about the situation at least 160 times, and created a Change.org petition, often seeking to go viral.  The campus radio station discussed the matter and the individuals involved on air, and has released videos parodying the situation.  Mr. Howe encouraged and facilitated students from the School of Business to wear specially designed t-shirts about the matter.  The campus newspaper, *The Lamron*, published articles about the situation, quoting Mr. Howe.

39.   At a Finance Committee meeting in April of 2018, Mr. Howe unexpectedly entered the room, though he was not invited and had no role there.  He sat down and stared at Ms. Bowles in a menacing manner; she was visibly upset and the Finance Committee Vice Chair, John Camiolo, tried to calm her, telling her to ignore Mr. Howe.  Later, Mr. Camiolo criticized Mr. Howe, noting that he engaged in such action intentionally.  President Battles encouraged Ms. Bowles to document the incident, which she did to the President and to Ms. Briggs, but upon information and belief, no further action was taken.

40.   The rest of the meeting seemed to go well.  The Board's Vice Chair, who was presiding on the Chair's behalf, noted the vast improvement from the tenor of the prior meeting and thanked Ms. Bowles.  However, at one point during the Executive Committee Meeting, at which President Battles was present, when Mr. Camiolo said that Mr. Howe's continuing negative behaviors and actions should cease, Jack Kramer, Foundation Board Chair emeritus, advised against further Board involvement.

41.     Many times with President Battles, Ms. Bowles discussed feeling physically threatened by Mr. Howe.  By way of examples and not limitation:  at dinner on Sunday, May 6, 2018 in Boston, President Battles and Ms. Bowles discussed their mutual sense of physical threat by Mr. Howe.  President Battles described an incident at a campus event on April 17, 2018 and other incidents with Mr. Howe, stating that she felt that she needed to be vigilant, even at her own home.  In response, Ms. Bowles said that she had installed the motion detection-recording device Ring at her home because she feared for her safety, and encouraged President Battles to do the same.  On a separate occasion, Ms. Bowles and President Battles discussed additional security measures for President Battles's residence with the Interim Vice President for Finance and Administration.

42.     During September and October meetings regarding the planning for donor recognition events and the Board meeting to be held in October of 2018, Ms. Bowles and President Battles discussed ongoing concerns about safety related to Mr. Howe.  President Battles directed Ms. Bowles to limit opportunities for Mr. Howe's attendance at events, and was adamant that he should not be invited to her (President Battles's) home.  Ms. Bowles and President Battles also considered whether campus police should be present at the events.

43.     On or about April 2, 2018, Mr. Howe filed a claim with the New York State Division of Human Rights, which was ultimately dismissed.  During the proceeding, Professor Levy admitted that the accosting of Ms. Bowles and threats against her were pre-meditated.  He also testified that to his knowledge, previous Advancement Vice Presidents had not been treated in this manner.  During the proceeding, Ms. Bowles stated that she had been the victim of gender/sex discrimination, for which she drew criticism and ire from Ms. Briggs and President Battles.

44.     Professor Howe's attacks continued through 2018 and even after Ms. Bowles's departure from the College.  In May of 2019, Professor Howe continued his harassment with false accusations and intent to harm Ms. Bowles during a presentation to the SUNY Board of Trustees at a meeting held on the College's campus and later, in statements to the *Livingston County News*.

45.     During a 2018 Cabinet meeting, President Battles received a threatening email from Mr. Howe, implying that there would be violence unless Ms. Bowles resigned.  However, during the same meeting, Ms. Battles and Ms. Briggs determined to do as little as possible in response to Howe's threats, thinking that it would lessen his ability to take action against the College.

46.     Although Ms. Bowles ensured that defendants were aware of the hostile work environment that Professor Howe created, they persistently and repeatedly failed to respond.  In fact, the College even conferred upon Howe the SUNY Distinguished Teaching Professor award in November of 2019.

### Additional Incidents, Including Defendants' Adverse Differential Treatment of Ms. Bowles Compared To Her Male Predecessors and Successor

47.     At an alumni event on Friday, June 1, 2018 at the Big Tree Inn in Geneseo, Mr. Camiolo kissed Ms. Bowles on the mouth.  That incident was witnessed by Mr. Johnston, among others.  Contrary to Mr. Camiolo's later claims, the kiss was not an awkward mistake, but rather an intentional act directed against Ms. Bowles, before a crowd that included Mr. Camiolo's fraternity brothers.

48.     The next week, Ms. Bowles related the incident to her Executive Assistant and the Director of Scholarship Giving.  Ms. Bowles herself did not report that incident to College officials because she feared retaliation, given the already hostile environment.  Mr. Camiolo's tem-

per and retaliatory conduct were previously experienced by other Advancement Office employees. For example, an Alumni Relations employee tearfully reported to Ms. Bowles that Mr. Camiolo threatened legal action because he claimed rights to a particular venue for his fraternity's event. Ms. Bowles intervened to calm the situation. Board members routinely referred to the Board as the "Boys Club," and President Battles told Ms. Bowles such things as "you thought you had left the South," "that is your problem," and to "be more likeable."

49.      In the spring of 2018, while Ms. Bowles had achieved or was on track to achieve and exceed all goals established by the Board and President, Foundation Board Chair John Gleason told her that "you'd better perform or else." Upon information and belief, this threat was in retaliation for complaints that Ms. Bowles had made against the Board and Harry Howe.[1] Because Ms. Bowles was already performing the duties of her position, Mr. Gleason's comment, upon information and belief, indicated that he wanted her to act stereotypically feminine, and to reflect Mr. Walley's instruction that Ms. Bowles should "show more emotion," "be less serious," and "let us solve your problems."

50.      Ms. Bowles's efforts to safeguard the confidentiality and privacy of donor information caused Board members to become angry with her many times from 2017 through 2018 because, upon information and belief, her male predecessors had not done so, pursuant to what was described as a "Boys Club," and what was, in effect, a "gentlemen's agreement."

---

[1] In 2019 and 2020, students and alumni petitioned President Battles and the Office of Diversity to address pervasive accounts of sexual assault on and off-campus, particularly at fraternity gatherings, and lamented that despite formal complaints, President Battles repeatedly failed to address the problems. *The Lamron* has highlighted these: https://www.thelamron.com/posts/2019/9/12/geneseos-failure-to-investigate-a-sexual-assault-allegation-is-unjustifiable and https://www.thelamron.com/posts/2020/3/6/sexual-assault-at-geneseo-students-frustrated-with-lack-of-action-by-administration-accountability-from-those-accused. In addition, students created an Instagram account, "@shareyourstorygeneseo," to illuminate the College's pervasive assault problem.

51.     Ms. Bowles notified President Battles, as well as Human Resources Assistant Vice President Julie Briggs and Cabinet members, of the hostile work environment and gender/sex discrimination that she regularly suffered during her tenure at the College.

52.     Ms. Bowles's experience and expertise in leading data management and diversity efforts and building board diversity has been highlighted in national professional journals, including *The Chronicle of Philanthropy*.

53.     Similarly at the College, Ms. Bowles sought to facilitate changes at the College for greater diversity and inclusion.  For example, Ms. Bowles asked an Alumni Relations employee to create affinity groups more reflective of the alumni and suggested an affinity group for diversity and multi-cultural focused organizations.  In reply, the employee said:  "we don't know those people."  Further, Alumni Relations employees complained that Ms. Bowles made them "feel guilty for being white," and actively defied Ms. Bowles's efforts to increase inclusivity.

54.     Upon information and belief, at or around this time, defendants also received complaints from alumni of discriminatory practices at the College.

55.     In August of 2018, President Battles told Ms. Bowles, during her annual review, that Board Chair John Gleason had requested that Board members be allowed to participate in Ms. Bowles's performance evaluation.  Upon information and belief, the Board did not do this previously for male Vice Presidents, though they were less experienced and less qualified than Ms. Bowles.

56.     In September of 2018, Ms. Bowles inquired with Ms. Briggs about the process for Family and Medical Leave (FMLA).  Ms. Bowles's doctors were concerned about her physical well-being and risk for heart attack and/or stroke, due to her abnormally high blood pressure and stress caused by defendants in their hostile work environment.  Ms. Bowles expressed concerns to Ms. Briggs that President Battles would retaliate against Ms. Bowles for taking FMLA leave.

57.    In preparation for the October 2018 Foundation Board meeting, Ms. Bowles spoke to President Battles regarding difficult conversations that were likely to emerge with the Board.  Ms. Bowles also discussed her concerns with Mr. Gleason, including the fact that the demands that defendants placed on her constituted differential, disparate treatment, as compared to her male predecessors.  President Battles told Ms. Bowles that she was correct to resist the Board's requests.  Still, President Battles refused to intervene, simply telling Ms. Bowles that it's "your problem," and "a test of your leadership."

58.    On September 6, 2018 at the SUNY Chief Advancement Officers joint meeting, Ms. Bowles queried her SUNY comprehensive college colleagues – most of whom are male – and they replied that their boards never made such requests of them.  Likewise, upon information and belief, the Board did not impose such requirements on Ms. Bowles's male predecessors.

59.    When Ms. Bowles complained that defendants treated her differently than they had her male predecessor, President Battles stated, among other things, that "no one cared" about his quality of performance or competence.

60.    At the Board's October 2018 "Committee on the Board" meeting, Board member nominations were on the agenda.  Mr. Gleason initiated the topic by stating, "Do we really want diversity?"  Board member Robert Walley echoed, "We can have diversity or money:  not both."  Ms. Bowles responded that Mr. Gleason's and Mr. Walley's assertions were inappropriate and false.  These highly discriminatory, demeaning, and distressing comments contributed to and exacerbated the hostile work environment created and maintained by defendants.  President Battles remained silent throughout the meeting, which was recorded by audiotape.

61.    After the meeting, Mr. Gleason and the Board retaliated against and intimidated Ms. Bowles, by criticizing her and suggesting that she should be replaced, though she had

achieved all established goals, including securing the most cash revenue in the College's history, increasing revenue, increasing the number of donors, spearheading a Fifty-Five Million Dollar ($55,000,000.00) campaign, creating sixteen (16) policies, holding a Board retreat, and addressing a backlog of compliance issues, including but not limited to required registration in 49 states and reviewing scholarships for compliance.

62.     Upon information and belief, defendants retaliated against and sought to discourage Ms. Bowles and force her to quit by, among other things, creating an impossible, hostile environment whereby she would not be able to continue to meet the overwhelming demands that defendants imposed on her.

63.     In fact, the Board lessened its requirements and oversight of Mr. Johnston, when President Battles appointed him Interim Advancement VP during Ms. Bowles's absence in late 2018 and early 2019.  For example during this time, Mr. Johnston – unlike Ms. Bowles – was not required to make regular calls to Board members and have complex agendas.

64.     Without a valid basis, the Board consistently favored Mr. Johnston over Ms. Bowles.

65.     Mr. Johnston had far less experience than Ms. Bowles, but he was compensated for his additional duties, though it is unclear what additional duties he actually had.  Likewise upon information and belief, the Board compensated the male Executive Directors preceding Ms. Bowles for such additional duties, but did not compensate her for them.

66.     Mr. Johnston received additional assistance when the College hired Roxanne Johnston as "Special Advisor" to the President for Advancement.  A former College employee, Ms. Johnston had also been a Vice President for Advancement at SUNY Brockport, yet she was hired, in part, to support Mr. Johnston, who had much less experience than her.

67.     While Mr. Johnston served as Interim Advancement VP, giving to the College declined by more than Two Million Dollars ($2,000,000.00+).  Though he had the support of a team of five major gift officers, Mr. Johnston failed to secure leadership gifts for the College's campaign.  In December of 2019, Mr. Johnston left the prestigious honors College for a small community college.

68.     During several conversations in September and October of 2018, Ms. Bowles again conveyed her concerns about discrimination to College officials.

69.     In October of 2018, Ms. Bowles learned that Board member Daniel Loughran had infantilized her by calling her a "petty junior high girl" because she had not allowed the Men's Ice Hockey coach, a white male, to break procedures, policies, protocols, and best practices. This was reported to President Battles by a former Board member via email correspondence.

70.     Mr. Loughran, the Treasurer and Chair of the Finance Committee, retaliated against and prevented Ms. Bowles from performing her job by refusing to meet with her, and by ignoring requests regarding official Board business, which caused the Foundation to suffer major losses.

71.     During 2017-18, Board member Kevin Gavagan sought to intimidate Ms. Bowles into hiring a young white male friend on several occasions. When Ms. Bowles informed Mr. Gavagan that the individual was unqualified for the openings available and thus would not be considered, he sent angry emails to Ms. Bowles in a continuing effort to convince her to hire him, though this would have violated policies and procedures regarding fair hiring practices.

72.     In addition to the incident with Mr. Camiolo, Ms. Bowles was kissed and hugged on numerous occasions, including without limitation, October 18-20, 2018 (during Board meeting and associated donor recognition events) by several male Board members, including, *e.g.*,

Messrs. Walley, Gavagan, and Camiolo, then again at an October 25, 2018 School of Business event in New York City, by Messrs. Walley and Gleason.

## Defendants Discriminate Further Against Ms. Bowles.

73.     On November 20, 2018, the day after she notified Mr. Johnston that he would be subject to a Performance Improvement Plan, Ms. Bowles received notice that she was being placed on "administrative leave," effective immediately.  Purportedly, the investigation focused on Ms. Bowles's working relationship with Mr. Johnston, and alleged wrongdoing by Ms. Bowles, arising out of a planned trip to Virginia, which was partially personal, while also including meetings with donors.

74.     The College alleged that Ms. Bowles also engaged in personal visits during that trip, at the College's expense. Ms. Bowles did not conduct personal visits at the College's expense.  Further, personal expenses were separated and pre-approved by the College.  For many years, the College's Advancement Division allowed personal visits to be combined with donor visits so long as the expenses were separated.  By way of example and not limitation, a male employee – John Linfoot,  Director of Special Projects – traveled to Florida and Pittsburgh for vacation with his wife, and the College paid for the part of the trip in which he visited donors.  Mr. Linfoot did this throughout his ten years at the College.

75.     Ms. Bowles denies any violation of College policy, or any other wrongdoing.

76.     Curiously, the alleged complaints against Ms. Bowles apparently all arrived at about the same time – late 2018 – although Ms. Bowles had then served as Advancement VP for more than two years.  It is also curious that despite starting its "investigation" in early November, the College did not advise Ms. Bowles of that investigation until late November, after she had notified a younger, male subordinate, whom the College favored, that he would receive a

PIP.  Even the College's November 20, 2018 letter placing Ms. Bowles on "administrative leave" made no mention of the investigation.

77.     The College apparently concluded its "investigation" in November of 2018, with the only remaining task being an interview of Ms. Bowles.  At about that time, Ms. Bowles was removed from work by her physicians, due to the medical issues resulting from stress and anxiety caused by defendants' hostile work environment, retaliation, and other discrimination.

78.     In December of 2018, Mr. Johnston requested permission – only from *male* Board members – to hire a male consultant to help with a planned gift based upon a recommendation of Mr. Linfoot, who is a friend of the consultant.  Mr. Johnston did not include the Audit Committee Chair (an African-American woman), or the female Development Committee Chair, nor the Board Secretary, who is also female.  As the person responsible for Planned Giving, Mr. Johnston should have been able to address donor questions himself.

79.     The male Board members and Mr. Johnston decided to spend monies without involving the Director of Advancement Services and Budget Manager, who was a woman.  Mr. Johnston signed a contract without completing the required forms, providing vendor's credentials, W9, and authorization from the College Controller.  As Assistant Vice President, Mr. Johnston was well aware of disbursement policies and procedures.  The fact that Mr. Johnston was not disciplined for such transgressions – while Ms. Bowles was punished when she did *not* transgress – confirm defendants' oral admissions that they created, fostered, and maintained a "Boys Club" environment.

80.     Starting in or about January of 2019, the College stopped providing Ms. Bowles with agendas or minutes from Cabinet meetings, though she remained a member of the Cabinet.  This action – which effectively demoted Ms. Bowles – was, upon information and belief, in re-

taliation for her complaints of discrimination, and because she had recently notified the College, through counsel, that she was filing a Complaint with the DHR.

81.     Before this time, Ms. Bowles reviewed her emails and forwarded to President Battles messages of concern.  One notable example was an email from Professors Levy and Howe, which Ms. Bowles believed was potentially threatening.  Previously, President Battles and Ms. Bowles had discussed how to respond to such emails.

82.     From the inception of her FMLA leave, Ms. Bowles expressed her willingness to help while she was out, but the Board removed Ms. Bowles from its communication platform, and destroyed her Foundation-issued credit card, in further retaliation, thereby effectively demoting her as the Foundation's Executive Director.  Further, the Board Chair requested information from Ms. Bowles regarding issues that suggested she would be terminated (thus comprising additional harassment, intimidation and retaliation in an already hostile work environment), and stopped meeting with her for regularly scheduled calls, which prevented Ms. Bowles from doing her job, and was, in effect, another demotion.

83.     Notwithstanding the ordeals she suffered as a result of defendants' actions and failures to act, Ms. Bowles submitted to the College's demand for a meeting the very first day that she returned from her medical leave:  February 11, 2019.  During that "interview," Ms. Briggs asked, among other things, whether Ms. Bowles's boyfriend had accompanied her on the final leg of a three-city trip to New York City, Boston, and Portland, Maine (he accompanied her to Portland only), although such questions were not asked of Ms. Bowles's colleagues, and no State or Foundation funds were used to pay for his portion of the trip.  The partners and spouses of other of the College's employees routinely accompany them on such trips.

84.     Ms. Briggs also asserted that Ms. Bowles had not repaid her executive assistant (and neighbor) for approximately Thirteen Dollars (~$13.00) worth of groceries purchased on a Sunday for Ms. Bowles's sick 25-year-old daughter when Ms. Bowles was out of the country. While Ms. Bowles believes that she did repay the executive assistant, she was not party to the details of the items or how they were purchased, nor to the agreement between two other adults while Ms. Bowles was abroad.  In any event, upon information and belief, this act by the College was simply a pretext to terminate her.

85.     Ms. Briggs also questioned a notation on Ms. Bowles's computer calendar regarding future dates when she would be in Virginia, where she could *potentially* see her doctors there and attend a meeting for another board on which she serves.  Ms. Bowles had also made a proposal to College donors in Virginia  and needed to follow up with them.

86.     Ms. Briggs knew of Ms. Bowles's health concerns as early as September of 2018, and she also knew that Ms. Bowles was a cancer survivor who experienced difficulty with resulting lymphedema.  Upon information and belief, Ms. Briggs's threatening, intimidating interrogation of Ms. Bowles at this time was retaliation for Ms. Bowles's then recently filed DHR Complaint against the College, which also named Ms. Briggs and President Battles.

87.     On March 21, 2019, two female employees in Ms. Bowles's Division complained to her that Mr. Camiolo had harassed and intimidated them, causing emotional distress.  In accordance with College policy and procedures, Ms. Bowles reported the incidents in writing to Ms. Briggs, President Battles, and the College's Chief Diversity Officer ("CDO").  President Battles responded on March 22, 2019 by saying that Ms. Bowles – not the College – should deal with the problem, but because she put the concerns in writing and copied the CDO, the College would investigate.  Ms. Bowles never learned the outcome of the investigation.

19

**Termination and Aftermath**

88.     Six days later, defendants terminated Ms. Bowles.  Upon information and belief, the formal decision to terminate Ms. Battles was made by the president of another SUNY university – and friend of President Battles.  Ms. Bowles had no prior knowledge of the action, and never gave consent to defendants' sharing of her confidential personnel records with that individual.

89.     The person who made the termination decision did not contact or interview Ms. Bowles.  Upon information and belief, SUNY policies vest their presidents with authority only over their own institutions, so defendants' termination of Ms. Bowles violated SUNY policies and was officially made by an outside party, who had neither authority nor first-hand knowledge of the facts.  Upon further information and belief, defendants' decision to vest an outsider with termination authority was intended as a pretextual effort by defendants to avoid responsibility for their own legal violations and other actions.

90.     By "Investigative Report" dated August 14, 2019, the College and Board essentially cleared themselves of any wrongdoing with regard to Ms. Bowles's allegations.

**Defendants' Additional, Post-Termination Wrongdoing**

91.     Defendants' termination of Ms. Bowles on March 28, 2019 came more than four months after they placed her on "administrative leave."  Upon information and belief, the College's "investigation" of Ms. Bowles by then had also been completed for approximately four months, except for the College's interview of Ms. Bowles, which occurred on or about February 11, 2019.

92.     When executives are dismissed, particularly from positions with a public profile such as Ms. Bowles's, it is common for the parties to confer on an agreed public statement that is

relatively neutral, so that the terminated executive will not bear the additional burden of negative speculation about the separation from employment.

93.     Here, however, defendants did not do that.  They offered Ms. Bowles no such opportunity, nor did they offer to transition her separation over a reasonable period of time.

94.     In fact, upon information and belief, Ms. Battles:

        a.      sent a campus-wide email, on or about March 29, 2019, stating that Ms. Bowles was "no longer serving … effective immediately"; and

        b.      told *The Lamron,* for an April 4, 2019 article, that:  "because it is a personnel issue and out of respect for my former colleague, Johnson Bowles, I will not share anything further about the nature of that transition," that the matter "really needs to be a confidential personnel situation," and that she would not discuss it further "out of deference to my former colleague and necessarily so."

95.     Upon information and belief, defendants owed duties to Ms. Bowles that included, among others, a basic obligation to handle her termination in a way that did not cause undue speculation or negative publicity.

96.     Defendants materially breached these duties, which caused substantial and continuing damages to Ms. Bowles.  For example, though Ms. Bowles has diligently searched for employment since her termination, including engaging recruiters to work on her behalf, defendants' mishandling of their termination of Ms. Bowles greatly and unnecessarily exacerbated the situation, causing Ms. Bowles to lose out on at least ten (10) positions for which she has interviewed in the interim, among other damages.

97.     Defendants could have terminated Ms. Bowles – an at-will employee – virtually any time after she was hired in early July 2016, but they did not do so because her performance was excellent.

98.     Only in late 2018, after Ms. Bowles had long complained to President Battles about harassment and other unlawful discrimination, and after Ms. Bowles had to discipline a younger, male employee favored by defendants, was there any mention of an "investigation" of Ms. Bowles.

99.     Upon information and belief, defendants knew or should have known that Ms. Bowles, who was 55 years old when they terminated her, would need to search for new employment, and such public comments to a print *and* on-line publication would seriously endanger her prospects for securing a new position.

100.    Given its leadership role, the Board could – and should – have served as a model of proper workplace conduct and principles.  Regrettably, the opposite happened:  the Board's strongly gendered environment appears to have bled over into the College (including the President's office), resulting in an intolerable situation where Board members – overwhelmingly white males of great privilege – regularly engage in misconduct with utter impunity.  For example, President Battles herself has acknowledged that Board members routinely hug and kiss female staff, including Ms. Bowles.

101.    Upon information and belief, defendants' actions against Ms. Bowles, including without limitation, their suspension, investigation, termination, and/or public comments thereon, were negligent, malicious, and/or in retaliation for Ms. Bowles's protected conduct, including without limitation, her longstanding complaints regarding sexual harassment and other unlawful discrimination against her and others at the College.

102.    Upon information and belief, defendants intentionally interfered with Ms. Bowles's prospective business or economic relationships with third parties, with the sole purpose of harming Ms. Bowles and/or through wrongful means, such as negative public comments.

103.    Defendants' discrimination has wrought devastating consequences on Ms. Bowles, including, by way of example and not limitation:  the need to seek medical care for conditions induced by stress and anxiety; substantial legal fees; being held out of work by her physician for over two months; wrongfully having her reputation impugned by a pretextual investigation; and facing the threat of termination, in her mid-50s, for unlawful reasons of discrimination and retaliation.

## **FIRST CAUSE OF ACTION:**

### **42 U.S.C. §1983 – FOURTEENTH AMENDMENT**

104.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

105.    Defendants discriminated against Ms. Bowles and treated her disparately on account of her sex and/or sex stereotyping, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

106.    The unlawful deprivations of Ms. Bowles's rights were committed by the defendants, who acted under color of state law.

107.    Defendants' disparate treatment of Ms. Bowles directly and proximately caused her damages for which she is entitled to compensation, and which would not have occurred in the absence of (but for) defendants' conduct.

## SECOND CAUSE OF ACTION:

### 42 U.S.C. §1983 – FOURTEENTH AMENDMENT

108.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

109.    Defendants subjected Ms. Bowles to a hostile work environment on account of her sex and/or sex stereotyping, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

110.    The unlawful deprivations of Ms. Bowles's rights were committed by the defendants, who acted under color of state law.

111.    The hostile work environment created by defendants directly and proximately caused damages to Ms. Bowles for which she is entitled to compensation, and which would not have occurred in the absence of (but for) defendants' conduct.

## THIRD CAUSE OF ACTION:

### 42 U.S.C. §1983 – FIRST AND FOURTEENTH AMENDMENTS

112.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

113.    Defendants retaliated against Ms. Bowles for, among other things:

a.      complaining about and opposing discrimination in public employment and education based on her sex and/or sex stereotyping, which is a matter of concern and a violation of, among other things, the First Amendment to the United States Constitution; and

b.      lawfully exercising her rights under the FMLA.

114.    The unlawful deprivations of Ms. Bowles's rights were committed by the defendants, who acted under color of state law.

115.    Defendants' retaliation against Ms. Bowles directly and proximately caused her damages for which she is entitled to compensation, and which would not have occurred in the absence of (but for) defendants' conduct.

### FOURTH CAUSE OF ACTION:

### 42 U.S.C. §2000e, *et seq.* ("TITLE VII")

116.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

117.    Defendants discriminated against Ms. Bowles and treated her disparately on account of her sex and/or sex stereotyping, in violation of Title VII.

118.    Defendants' disparate treatment of Ms. Bowles directly and proximately caused her damages for which she is entitled to compensation.

### FIFTH CAUSE OF ACTION:

### TITLE VII

119.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

120.    Defendants subjected Ms. Bowles to a hostile work environment on account of her sex and/or sex stereotyping, in violation of Title VII.

121.    The hostile work environment created by defendants directly and proximately caused damages to Ms. Bowles for which she is entitled to compensation.

## SIXTH CAUSE OF ACTION:

### TITLE VII

122.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

123.    Defendants retaliated against Ms. Bowles for:

a.      complaining about and opposing discrimination in public employment and education based on her sex and/or sex stereotyping, which is a matter of concern and a violation of, among other things, the First Amendment to the United States Constitution; and

b.      lawfully exercising her rights under the FMLA.

124.    Defendants' retaliation against Ms. Bowles directly and proximately caused her damages for which she is entitled to compensation.

## SEVENTH CAUSE OF ACTION:

### NEW YORK STATE CONSTITUTION:  ARTICLE I, SECTION 1

125.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

126.    Defendants discriminated against Ms. Bowles and treated her disparately on account of her sex and/or sex stereotyping, in violation of Article I, Section 1 of the New York State Constitution.

127.    Defendants' disparate treatment of Ms. Bowles directly and proximately caused her damages for which she is entitled to compensation.

## EIGHTH CAUSE OF ACTION:

## NEW YORK STATE CONSTITUTION:  ARTICLE I, SECTION 1

128.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

129.    Defendants subjected Ms. Bowles to a hostile work environment on account of her sex and/or sex stereotyping, in violation of Article I, Section 1 of the New York State Constitution.

130.    The hostile work environment created by defendants directly and proximately caused damages to Ms. Bowles for which she is entitled to compensation.

## NINTH CAUSE OF ACTION:

## NEW YORK STATE CONSTITUTION:  ARTICLE I, SECTION 8

131.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

132.    Defendants retaliated against Ms. Bowles for, among other things:

a.    complaining about and opposing discrimination in public employment and education based on her sex and/or sex stereotyping, which is a matter of concern and a violation of, among other things, Article I, Section 8 of the New York Constitution; and

b.    lawfully exercising her rights under the FMLA.

133.    Defendants' retaliation against Ms. Bowles directly and proximately caused her damages for which she is entitled to compensation, and which would not have occurred in the absence of (but for) defendants' conduct.

## TENTH CAUSE OF ACTION:

## NEW YORK HUMAN RIGHTS LAW, ARTICLE 15

134.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

135.    Defendants discriminated against Ms. Bowles and treated her disparately on account of her sex and/or sex stereotyping, in violation of the New York Human Rights Law, thereby directly and proximately caused her damages for which she is entitled to compensation.

## ELEVENTH CAUSE OF ACTION:

## NEW YORK HUMAN RIGHTS LAW, ARTICLE 15

136.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

137.    Defendants subjected Ms. Bowles to a hostile work environment on account of her sex and/or sex stereotyping, in violation of the New York Human Rights Law, thereby directly and proximately caused her damages for which she is entitled to compensation.

## TWELFTH CAUSE OF ACTION:

## NEW YORK HUMAN RIGHTS LAW, ARTICLE 15

138.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

139.    Defendants violated the New York Human Rights Law by retaliating against Ms. Bowles for, among other things:

a.      complaining about and opposing discrimination in public employment and education based on her sex and/or sex stereotyping, which is a matter of concern and a violation

of the First Amendment to the United States Constitution and Article I, Section 8 of the New York Constitution; and

      b.     lawfully exercising her rights under the FMLA.

140.    Defendants' retaliation against Ms. Bowles directly and proximately caused her damages for which she is entitled to compensation.

<b><u>THIRTEENTH CAUSE OF ACTION:</u></b>

<b>INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONSHIPS</b>

141.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

142.    Upon information and belief, the defendants maliciously interfered with prospective (but inevitable) third-party relationships because defendants knew that Ms. Bowles would need to search for new employment.

143.    Upon information and belief, defendants interfered through wrongful means and/or acted for the sole purpose of inflicting harm on Ms. Bowles, thereby directly and proximately causing her damages for which she is entitled to compensation.

<b><u>FOURTEENTH CAUSE OF ACTION:</u></b>

<b>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</b>

144.    The foregoing paragraphs are repeated and realleged with the same force and effect as if they were fully set forth herein.

145.    Upon information and belief, defendants breached duties that they owed to Ms. Bowles, thereby unreasonably causing her physical safety to be endangered, and/or causing her to fear for her own safety.

146.     Defendants' negligence proximately caused substantial monetary and emotional harm to Ms. Bowles, including, by way of example and not limitation, severe health problems that, among other things, required her to take medical leave and to receive ongoing medical treatment; and severe and lasting embarrassment, humiliation, and anguish, and other incidental and consequential damages and expenses for which Ms. Bowles is entitled to compensation.

**WHEREFORE,** Ms. Bowles respectfully requests judgment against the defendants as follows:

1.     On each cause of action, compensatory and punitive damages in amounts to be determined;

2.     All accrued interest and attorneys' fees as provided by law; and

3.     Such other and further relief as the Court may deem just and proper, including without limitation, the costs and disbursements of this action.

## <u>JURY DEMAND</u>

Ms. Bowles requests a jury trial of all claims herein.

Dated:  January 21, 2021
        Rochester, New York                  Respectfully submitted,

                                             /s/  John T. Refermat_____
                                             John T. Refermat
                                             REFERMAT HURWITZ & DANIEL PLLC
                                             *Attorneys for Plaintiff*
                                             919 Winton Road South, Suite 314
                                             Rochester, New York  14618
                                             (585) 497-2700
                                             jrefermat@rhdlaw.com